2078

Edith JACKSON, Reginald Baker, Carver Jackson, individually and doing business as Jamarr Beauty and Distribution Company, Appellants v. BI-LO STORES, INC., James Thomas, d/b/a/ Thomas and Associates, and/or Thomas Distribution, Inc., Marshall Collins, John Prengaman, Patrick Curran and Bart Sims, Respondents.

(437 S.E. (2d) 168)

Court of Appeals

*Donna Mosley Coleman* and *P. Scott Neville, Jr.*, Chicago, IL, *for appellants.*

*Kenneth E. Young* and *Edwin L. Turnage,* of *Nelson,*

*Mullins, Riley & Scarborough;* and *Kim Varner*, of *Hunter & Varner*, Greenville, *for respondents.*

*James Thomas, pro se.*

Heard Sept. 7, 1993

Decided Oct. 4, 1993.

CURETON, Judge:

Appellants ("Partners") brought this action alleging two common law torts, wrongful interference with a contract and civil conspiracy, and a statutory violation of the South Carolina Unfair Trade Practices Act (UTPA)[1] against respondents Bi-Lo, Inc. ("Bi-Lo"); Marshall Collins, John Prengaman and Patrick Curran (hereinafter collectively "the Bi-Lo respondent"); James Thomas ("Thomas"); and Bart Sims ("Sims"). The court granted summary judgment in favor of all respondents except Sims on all claims. Partners appeal. We affirm.

The appellants and respondent Thomas were partners under an oral partnership agreement operating a business known as Jamarr Beauty and Distribution Company (Jamarr). Jamarr, a small retail operation, provided ethnic hair care products for approximately twenty-five Bi-Lo stores pursuant to an oral agreement with no fixed term of years. Prior to receiving Bi-Lo's business, Jamarr was not in the wholesale business.

Although Bi-Lo normally did not enter into written contracts with vendors, it gave Jamarr a contract to help Jamarr obtain financing from NCNB for its new wholesale venture. This contract increased Jamarr's business with Bi-Lo by providing that Jamarr would service all Bi-Lo stores in South Carolina, North Carolina and Georgia. This agreement automatically renewed each year, but either party could elect not to renew the contract, for any reason, by giving ninety (90) days notice prior to its expiration date.

Prior to signing this contract, Jamarr's partners agreed to pay Sims, a former Bi-Lo employee, and Sim's associate, Grillo, for increasing Jamarr's business with Bi-Lo. This arrangement was secret and Bi-Lo was not informed of it. They

[1] S.C. Code Ann. §§ 39-5-10, *et seq.* (1976).

entered into a written agreement whereby Jamarr promised to pay Grillo and Sims 4.5% of Jamarr's gross sales to Bi-Lo. The record reflects Jamarr gave at least thirteen checks to Sims and Grillo totaling over 18,000.00. Baker, one of the partners, testified that "the payments were made on the assumption that we were going to continue to do business with Bi-Lo . . . the reason why we were willing to give him a percentage of the proceeds was that he was able to pull it [the Bi-Lo contract] together."

Prior to and during the contract period, Thomas was Jamarr's only contact person and sales representative to Bi-Lo. Partner Edith Jackson testified that James Thomas was "the liaison between Bi-Lo and Jamarr."

On May 11, 1990, Thomas sent a letter to his partners advising them that he was withdrawing from the partnership, and thus, dissolving it. In his summary judgment affidavit, Thomas stated the reason for his withdrawal was that his partners were "exercising extremely poor business judgment." He also stated that the partners were incurring high costs for perks and not reimbursing the company. The withdrawal letter proposed that either he or the remaining Jamarr partners "consider entering into a replacement contract" with Bi-Lo. A copy of this letter was sent to Bi-Lo's president.

Bi-Lo then timely notified Jamarr in writing on May 22, 1990 of its intention not to renew their agreement which was due to expire on August 21, 1990. Bi-Lo advised that it would select a new distributor to be effective after August 21, 1990. Bi-Lo then invited, interviewed and received bids from several vendors, including two minority vendors, the remaining Jamarr partners and Thomas' newly formed business.

A price comparison conducted by Bi-Lo indicated Thomas' bid had a four percent price advantage over Jamarr's reformed partnership, but exceeded the bid of a least one of the non-minority vendors. The ethnic hair care contract was nevertheless awarded to Thomas because Bi-Lo sought to keep its ethnic hair care business with a minority vendor.

The partners contend that Bi-Lo interfered with its partnership agreement by urging Thomas to withdraw from the Jamarr partnership and set up his own business and Bi-Lo would, in turn, award the ethnic hair care contract to Thomas. The dispositive issues presented by this appeal are (i)

whether partners are barred from asserting damages based on a contract which was secured by admitted illegal conduct, and (ii) viewed in the light most favorable to the partners, was there a genuine issue of material fact regarding any of their claims.

Respondents maintain that the Bi-Lo contract is wholly inoperative under the governing law of South Carolina because the partner's admitted course of conduct during the course of their performance of the contract was illegal. They further maintain that because partners' alleged damages consists solely of lost profits from this illegal contract, they are barred from any recovery. We agree.

It is a well-founded policy of law that no person be permitted to acquire a right of action from their own unlawful act and one who participates in an unlawful act cannot recover damages for the consequence of that act. 86 C.J.S. *Torts* § 12 (1954). This rule applies at both law and in equity and whether the cause of action is in contract or in tort. 1A C.J.S. *Actions* § 29 (1985). *See also Graham v. Graham,* 276 S.C. 341, 278 S.E. (2d) 345 (1981); *Nelson v. Bryant,* 265 S.C. 558, 220 S.E. (2d) 647 (1975); *Roundtree v. Ingle,* 94 S.C. 231, 77 S.E. 931 (1913); Restatement (Second) of Torts § 774 (1977).

The illegality doctrine has also been recognized by the United States Supreme Court which, in *McMullen v. Hoffman,* 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1989), held illegality is a defense to contract action:

> The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, *nor will they enforce any alleged rights directly springing from such contract.*

*Id.* at 654, 19 S.Ct. at 845 (emphasis added). South Carolina courts have reached similar conclusions refusing to aid plaintiffs who are themselves guilty of an illegal act. In *Roundtree,* the court concluded that "[his] whole transaction is without the pale of the law, and [he] cannot invoke the aid of the courts in enforcement of any claim depending on it." *Id.* 77

S.E. at 932. *See also, Berkebile v. Outen,* — S.C. —, —, 426 S.E. (2d) 760, 762 (1993) ("an illegal contract has always been unenforceable . . . South Carolina courts will not enforce a contract which is violative of public policy, statutory law or provisions of the Constition.").

Here, all damages alleged by the appellants arise from nonrenewal of the Jamarr contract with Bi-Lo. It is undisputed that the partners made payments totalling over eighteen thousand dollars to Bart Sims, then a Bi-Lo buyer, on behalf of Jamarr to help secure, maintain, and increase the Bi-Lo business. Under South Carolina law, payments to an employee of a corporation for the purpose of obtaining, increasing or retaining its business is a crime.[2] Based on the testimony in this record, a reasonable jury could only conclude the Jamarr partners committed the crime of bribery.

The partners make several new arguments relating to estoppel and ratification in their reply brief. However, these arguments are not properly before this Court because an appellant cannot make new arguments for reversal in a reply brief. *Fuller-Ahrens Partnership v. S.C. Dep't of Highways,* — S.C. —, 427 S.E. (2d) 920 (Ct. App. 1993). Appellants also contend the illegal payments to Sims did not affect their partnership agreement and consequently, are not connected to their claims for intentional interference with the Jamarr partnership contract, civil conspiracy and violation of the UTPA.

We find this argument unpersuasive. The right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid, enforceable contract. A contract which contravenes public policy is void, and an action cannot be maintain for ei-

---

[2] Section 16-17-540 defines the crime of "Bribery with respect to agents, servants or employees" as follows:

any:

(1) person who corruptly gives offers or promises to an agent, employee or servant any gift or gratuity, whatever, with intent to influence his action in relations to the principal's, employer's or master's business;

\* \* \* \*

Shall be punished by a fine of not more than $500 or by such fine and imprisonment for not more than one year.

S.C. Code Ann. § 16-17-540 (1976).

ther its breach or for inducing its breach. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129, at 994 & n. 68 (5th ed 1984); James O. Pearson, Jr., Annotation, *Liability for Interference with Invalid or Unenforceable Contract*, 96 A.L.R. (3d) 1294 (1979).

Although this court has held that the illegality defense does not apply to "an independent contract," the gravamen of the complaint at issue here is the Bi-Lo agreement. *See, Nelson v. Bryant*, 265 S.C. 558, 220 S.E. (2d) 647, 648 (1975). The bribes to Sims and Grillo, made to acquire and maintain the Bi-Lo agreement, are inseparable from appellants' alleged damages, that consist solely of loss profits flowing from the expired Bi-Lo agreement. The partnership, in fact, had no other revenues because Bi-Lo was Jamarr's only customer.

In *Bryant*, the defendant, acting as an agent for the plaintiff, used the plaintiff's winning ticket to claim a car won in the County fair drawing or lottery. The defendant then refused to give title and possession of the car to the plaintiff. The court permitted the plaintiff to recover reasoning that the lawsuit was not based on the illegal lottery, but on the agreement made before the drawing, thus, the action did not depend on any right to collect a gambling debt. Therefore, enforcement of the obligation was not repugnant to public policy. We do not believe the same could be said of the bribery practiced here.

The admissions made in the partners' depositions unequivocally establish their willingness to resort to any means to produce the business results they sought. In referring to his dealings with Sims, one of the partners testified, "I guess there would be some illegalness [sic] there . . . but . . . we were trying to acquire more business, so we didn't have any other choice." This so taints the entire endeavor as to render the claims of the partners, which derive solely from the illegal agreement, unenforceable. Thus, we conclude that public policy would be offended by permitting the partners, who were all parties to the illegal contract, to invoke the aid of our courts to enforce any claims depending on it.

Accordingly, for the above reasons, the trial court's order granting summary judgment is hereby

Affirmed.

HOWELL, C.J., and GOOLSBY, J., concur.