**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GEORGE VESSELL,
Plaintiff-Appellant,

and

UNITED STATES OF AMERICA, ex
relatio,
Plaintiff,

v.

DPS ASSOCIATES OF CHARLESTON,
INCORPORATED, d/b/a Remax
Professional Realty, a/k/a DPS of
Charleston, Incorporated;
CANDACE N. PRATT, Broker-In-

Charge; DAVID FINN; JANINE
TOWNSEND; FRED RICE,
Defendants-Appellees,

and

THOMAS J. GIBBONS; BILL KONEFAL;
HOWARD JACKSON; CENTURY PEST
CONTROL, INCORPORATED; FRANK
THOMPSON; THOMPSON & SONS;
PRUDENTIAL CAROLINAS REALTY;
RESULTS REALTY; AGENT-OWNED
REALTY; ANITA DUNN,
Defendants.

No. 97-1484

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Chief District Judge.
(CA-95-1887-2-12)

Argued: December 4, 1997

Decided: July 8, 1998

Before WILKINSON, Chief Judge, and ERVIN and
MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Chief Judge Wilkinson and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Gregg Meyers, PRATT-THOMAS, PEARCE, EPTING
& WALKER, P.A., Charleston, South Carolina, for Appellant.
Charles R. Norris, NELSON, MULLINS, RILEY & SCARBOR-
OUGH, L.L.P., Charleston, South Carolina, for Appellees. **ON
BRIEF:** Craig E. Burgess, NELSON, MULLINS, RILEY & SCAR-
BOROUGH, L.L.P., Charleston, South Carolina, for Appellees.

_____

**OPINION**

ERVIN, Circuit Judge:

This case comes before us on the district court's grant of judgment
as a matter of law for the defendant-appellee, DPS Associates, a real
estate agency doing business as Re/Max Professional Realty
("Re/Max"). The plaintiff-appellant, George Vessell, had claimed
breach of contract under state law and retaliatory discharge under the
False Claims Act, 31 U.S.C. § 3729 et seq. (1994). The district court
correctly found that any contract between Vessell and Re/Max was
saturated with fraud and thus unenforceable, and that Vessell, who
was at best an independent contractor, could not recover for retalia-
tory discharge under the False Claims Act because its coverage
extends only to employees. We therefore affirm the district court's
resolution of Vessell's claims.

I.

When the United States decided to close its Navy base in Charles-
ton, South Carolina, the government, under its Housing Assistance

Program ("HAP"), acquired the homes of government employees forced to sell their homes because of the closing. Under the HAP, the United States would manage and sell the homes over time to avoid having to sell all of the homes in the depressed market that likely would result from the base closing.

The United States Army Corps of Engineers, which oversaw the HAP, contracted with various real estate agencies to manage and sell the homes. One of the real estate agencies was the Re/Max agency in this case, which operated under the supervision of Broker-In-Charge Candace Pratt. The winning Re/Max bid was one of three submitted by that Re/Max office, and had been prepared by Re/Max agent Tom Gibbons.

In preparing the bid, Gibbons requested that George Vessell estimate how much he would charge for the lawn maintenance and upkeep on the HAP properties. Vessell had been a Re/Max agent himself at one time, and had since started a landscaping company. His company maintained several yards for Gibbons and other Re/Max agents. Vessell estimated to Gibbons that it would cost $43 per yard for the initial yard cutting and $20 every two weeks to maintain the yards. Vessell stated that Gibbons asked him not to provide a quote for any of the other agents in the Re/Max office who were preparing bids.

In the bid he submitted to the Corps of Engineers, Gibbons quoted $0 for the initial cutting and $12 for recurring cuttings. He stated that he did this to "get the contract for Re/Max." In March, 1994, the Corps of Engineers opened the sealed bids and awarded one of the contracts to Re/Max based on Gibbons's bid. One of the other bidders disputed the award; the bid acceptance was not finalized until July, 1994. The one-year contract had renewal options for two more years.

Gibbons informed Vessell that he had bid the yardwork at $0/12 soon after he submitted the bid. Vessell argued with him about the amount and prepared a breakdown of his costs to show Gibbons why he could not cut the yards for that amount and still make a reasonable profit. Vessell refused to cut the lawns at that amount. Gibbons suggested that Vessell recover the price by bid-rigging and stealing appliances to make up the difference. When Vessell protested, Gibbons

3

said that landscapers were easy to come by and that Vessell would not get the HAP job if he did not cooperate.

Vessell had engaged in a similar enterprise with Gibbons in the past. Vessell would remove "abandoned" personal property and appliances from bank-repossessed homes and sell them at Gibbons's direction. Vessell maintained that Gibbons said the removals were authorized and that he, Vessell, did not know otherwise, but that the current enterprise suggested by Gibbons made Vessell realize that the prior actions had probably been illegal.

Vessell decided to turn Gibbons in to the FBI. He considered, but dismissed, the idea of talking to Broker-in-Charge Pratt, because his previous experience with her led him to believe she would be ineffective in dealing with Gibbons. Vessell contacted FBI agent Quick, with whom he worked over the next several months. Quick directed Vessell to cooperate with Gibbons and not to tell Pratt about Gibbons's practices. Vessell thus sold appliances, as suggested by Gibbons, and created an apparent "slush fund" out of which Gibbons could pay legitimate expenses incurred in the management of the HAP properties. The FBI paid Vessell's fees for the lawn maintenance; he did not take monies out of the slush fund.

Vessell started cutting lawns around August 1, 1994. The FBI conducted its "sting" operation against Gibbons in November. The FBI did not direct its investigation against any other members of the Re/Max staff, and Re/Max continued to operate under the HAP contract, which was renewed for the two years permissible under the original contract with increased rates awarded for lawn maintenance.

After the sting, Vessell sought to continue cutting HAP lawns for Re/Max, but received no response from the Re/Max office. According to Vessell, Re/Max managed and marketed an average of 180 homes at a time under the HAP contract. When he could not get the HAP work, he gave up landscaping and has since become a private investigator.

Vessell brought suit under the False Claims Act against Gibbons, Re/Max, and various Re/Max agents. The United States intervened, as it is entitled to do in False Claims Act cases, and settled its claims

4

against Re/Max, Candace Pratt, Gibbons, and other interested parties on February 28, 1997.

Vessell's primary claim was that he should be permitted to carry out the terms of the contract he allegedly made with Re/Max through Gibbons. He further argued that Re/Max retaliated against him in violation of the False Claims Act by refusing to carry out the terms of his contract. Vessell's action went to trial in March, 1997, and the district court directed a verdict against Vessell. The United States chose not to intervene in Vessell's appeal from that verdict.

II.

The district court had jurisdiction over Vessell's False Claims Act claim under 31 U.S.C. § 3732(a) and exercised supplemental jurisdiction over Vessell's state law claims under 28 U.S.C. § 1367. We have jurisdiction over Vessell's timely appeal under 28 U.S.C. § 1291.

III.

Vessell first contends that the district court erred in dismissing his breach of contract claim. The district court directed a verdict that no contract existed between Vessell and Re/Max because 1) Vessell had not demonstrated a meeting of the minds between the parties; 2) there was no mutuality of obligation; and 3) Vessell's contract, if any, was between him and Tom Gibbons, a Re/Max agent, and not between him and the Re/Max agency. The district court further held that any contract the parties could be said to have had was saturated with fraud and thus unenforceable.

"Judgment as a matter of law is proper when without weighing the credibility of the evidence there can be but one reasonable conclusion as to the proper judgment." Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996). Our review of the district court's decision is plenary. Id. We must view the evidence in the light most favorable to the non-moving party. Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 683 (4th Cir. 1995).

5

In order to have a binding contract, the parties must have a meeting of the minds with regard "to all essential and material terms of the agreement." Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989). These essential terms include price, time, and place. Edens v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978). The meeting of the minds cannot be based on "secret purpose or intention on the part of one of the parties, stored away in his mind and not brought to the attention of the other party." Player, 382 S.E.2d at 894.

Vessell argues that he and Gibbons had a meeting of the minds. He contends that, after wrangling over the difference in price between Vessell's proposal and Gibbons's bid, they agreed Vessell would do the work for $12 per yard and make up any difference through the "slush fund" that would be created by the sale of appliances. He contends that his actual work cutting the lawns is evidence of this deal, and that he further had a deal to cut the lawns at the straight price of $26 and $27 per yard once the Corps of Engineers renewed the contract and agreed to modify the contract price for option years two and three.

Whether the parties have a meeting of the minds is ordinarily a question of fact for the jury to decide. Hobgood v. Pennington, 387 S.E.2d 690, 693 (S.C. App. 1989). In this case, however, the most Gibbons and Vessell could be said to have had agreed on was a deal whereby Vessell would be minimally paid for mowing lawns, and would supplement his lawn-mowing pay by stealing and selling household appliances. This court will not set its imprimatur on a contract permeated with fraud. See W&N Construction Co. v. Williams, 472 S.E.2d 622, 623 (S.C. 1996) (construction company cannot recover on contract it had entered illegally); Jackson v. Bi-Lo Stores, Inc., 437 S.E.2d 168, 170 (S.C. App. 1993) (contract secured by illegal conduct cannot be enforced). Thus, even if a jury, taking all the evidence in Vessell's favor, could have found that Gibbons and Vessell had a contract, any such contract was unenforceable and the district court appropriately directed a verdict on Vessell's breach of contract claim.

Vessell cannot show that he had an enforceable contract for the first year of the HAP contract. Any argument that his contract was

6

effectively renewed by virtue of the Corps of Engineers' renewal of Re/Max's HAP contract must therefore fail as well.

Vessell argues that not enforcing his contract violates public policy by penalizing him for cooperating with law enforcement officials. This argument has some appeal, but is not ultimately persuasive. It ignores the fact that Vessell entered into the alleged contract knowing its fraudulent aspects. This is not a situation in which he was already working for Gibbons, or Re/Max, under a legitimate contract, which Gibbons then "modified" by requiring unlawful behavior. In this instance, Vessell could have walked away from the entire business.

Our holding that Gibbons and Vessell had an unenforceable contract effectively disposes of Vessell's remaining arguments on his contract claim. Even were we to find that Gibbons had actual or apparent authority to bind Re/Max to the contract, and that Vessell and Re/Max were mutually obligated to perform the terms of the contract, the fraudulent underpinnings of the contract would defeat its enforceability.

IV.

The False Claims Act encourages private plaintiffs, acting on behalf of the government, to prosecute any person who is attempting to defraud the government. 31 U.S.C. § 3729. The False Claims Act is also known as the Qui Tam Act, an abbreviation of "qui tam pro domino rege quam pro si ipso in hac parte sequitur," which means one "[w]ho sues on behalf of the King as well as for himself." Black's Law Dictionary 1251 (6th ed. 1990). It was originally adopted in 1863, and is based on the premise that private parties are often in a better position to detect fraudulent activity than the government itself. Congress amended the False Claims Act in 1986 to include an anti-retaliation provision to protect "whistle blowers" from adverse employment consequences as a result of their cooperation with the federal government. False Claims Amendments Act, Pub. L. No. 99-562, § 4, 100 Stat. 3153 (codified at 31 U.S.C. § 3730(h)).

The anti-retaliation provision of the False Claims Act provides that:

7

> any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). Vessell claims that Re/Max's refusal to use his landscaping service after he cooperated with the FBI in exposing Gibbons's scheme violated the anti-retaliation provision of the statute. The district court found that Vessell was not an employee of Re/Max and therefore was not entitled to protection under the plain language of the statute.

On appeal, Vessell argues that the statute should not be read so narrowly. He describes himself as a "subcontractor employee," which is a defined term in the HAP contract, Joint Appendix at 172, and contends that the presence of the word "employee" places him under the statute's protection. He further argues that the provision should be read to protect independent contractors. In addition, Vessell argues that public policy dictates that he not be punished for having exposed Gibbons's fraud.

The False Claims Act does not define "employee." No circuit court has yet addressed whether the False Claims Act's protection of "employees" extends to independent contractors, though the few district courts that have addressed the question have all held that it does not. In Shapiro v. Sutherland, which involved a consultant who had formerly been an employee of a government contractor, the district court applied the common-law agency test to determine whether the qui tam plaintiff was an employee entitled to invoke § 3730(h), or an independent contractor who did not fall within the law's ambit. 835 F. Supp. 836, 837-38 (E.D. Pa. 1993); see also Hardin v. DuPont Scandinavia, 731 F. Supp. 1202, 1205 (S.D.N.Y. 1990) (holding in dicta that anti-retaliation provision does not extend to independent contractors); cf. Mruz v. Caring, Inc., 991 F. Supp. 701 (D.N.J. 1998) (liability under qui tam statute does not extend to employer's agents).

8

The Shapiro court applied the common-law agency test articulated in Nationwide Mutual Insurance Company v. Darden , 503 U.S. 318 (1992), to determine whether the plaintiff had been an employee or an independent contractor. In Darden, an ERISA case, the Supreme Court reiterated its position that when Congress uses the term "employee" without defining it, the Court has concluded that Congress intends to describe the conventional master-servant relationship as understood by common-law agency doctrine. 503 U.S. at 322-23. The Court set forth the test as follows:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. at 323-24 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989) (internal citations omitted)).

Applying the common-law agency principles in this case leads to the conclusion that Vessell was not Re/Max's employee. Vessell set his own schedule for cutting the lawns; he owned his own tools; and he hired, fired, and supervised his own assistants. In addition, his work was not part of the regular business of the hiring party; he did not receive any employee benefits; and his tax status was not that of an employee. Vessell had at most a contract to perform services for a specified period of time; he was to be paid for each service performed, not on a salaried basis.

Vessell's attempt to categorize himself as a "subcontractor employee" is unavailing. The term as used in the HAP contract refers

9

to employees of subcontractors hired by the main contractor; as such, one of Vessell's employees might more properly be termed a "sub-contractor employee." That contractual language, however, has no effect on the statute's coverage.

Unless the anti-retaliation provision of the False Claims Act covers independent contractors, Vessell's claim must fail. The plain language of the statute includes only employees, and our inquiry generally stops there. Other provisions of the False Claims Act, which permit anyone with knowledge of wrongdoing to bring a qui tam action and to share in the proceeds of the suit, 31 U.S.C.§ 3730(b)-(d), indicate that Congress was perfectly capable of extending the statute's coverage as broadly as it desired. In contrast, the anti-retaliation provision is limited by its express language to employees. We must presume that Congress intended to so limit the anti-retaliation provision.

Even were we to examine the legislative history, our conclusion would not change. The legislative history to the 1986 amendments indicates only that the term "employee" is to be read broadly to include "[t]emporary, blacklisted, or discharged workers," but says nothing about including independent contractors. S. Rep. No. 99-345, at 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299.

Vessell's public policy argument is not wholly unpersuasive. If an independent contractor were to learn of, and expose, the fraud of a principal contractor, the independent contractor should not lose its contract by virtue of having exposed wrongdoing any more than an employee should. Nevertheless, the statutory language is plain and does not, by its terms, extend to independent contractors. Moreover, independent contractors would have a breach of contract remedy, whereas an employee-at-will would not have such protection. The facts of this particular case demonstrate the principle. Had Vessell's contract not been permeated with fraud, he would have had a contractual remedy against Gibbons, and potentially against Re/Max, so long as he could have established mutuality of obligation and Gibbons's apparent authority to bind Re/Max to the contract.

The anti-retaliation provision of the False Claims Act does not extend to independent contractors, and Vessell is therefore not covered.

10

V.

The district court's grant of judgment as a matter of law is affirmed. The only contractual arrangement Vessell could be said to have had with Re/Max was tainted by fraud and thus unenforceable. Vessell is not entitled to recover under the anti retaliation provision of the False Claims Act because he was, at most, an independent contractor and thus is not protected by that provision of the Act.

<u>AFFIRMED</u>

11