**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Supreme Court**

Paul Branco and Branco Investments, Inc., d/b/a Great American Cookie Co., Petitioners,

v.

Hull Storey Retail Group, LLC and Sumter Mall, LLC, Respondents.

Appellate Case No. 2021-000233

---

**ON WRIT OF CERTIORARI TO THE COURT OF APPEALS**

---

Appeal from Sumter County
R. Ferrell Cothran Jr., Circuit Court Judge

---

Memorandum Opinion No. 2023-MO-009
Heard March 29, 2023 – Filed May 24, 2023

---

**REVERSED**

---

John S. Simmons, of Simmons Law Firm, LLC, of Columbia; and Patrick McFadden Killen, of Sumter, for Petitioners.

Miles Edward Coleman, of Nelson Mullins Riley & Scarborough, LLP, of Greenville; and John M.

Markwalter, of Hull Property Group, LLC, of Augusta, GA, for Respondents.

---

**PER CURIAM:** This appeal involves a dispute over leased space in the Sumter Mall that housed a Great American Cookie Co. ("GACC") franchise. Paul Branco and Branco Investments (collectively, "Petitioners") brought this action for tortious interference with a contract against the Hull Storey Retail Group and the Sumter Mall (collectively, "Respondents"), alleging their conduct caused a third party to abandon a contract to purchase certain GACC assets when their mall lease expired. The trial court ruled in favor of Petitioners and awarded damages. The court of appeals reversed. *Branco v. Hull Storey Retail Group, LLC*, No. 2021-UP-009, 2021 WL 118536, at *1 (S.C. Ct. App. filed Jan. 13, 2021). This Court has granted a petition for a writ of certiorari to review the decision of the court of appeals. We reverse.

## I.

On December 30, 2002, Paul and Anne Branco ("the Brancos"), executed a ten-year lease of a store in the Sumter Mall, where they operated a GACC franchise. The lease was set to expire on April 30, 2013. The assets of the GACC franchise were held in the name of their company, Branco Investments, Inc.

Near the end of their ten-year lease, the Brancos considered several options before ultimately deciding to sell their GACC assets (equipment and inventory) and get out of the business when their lease expired. In January 2013, Paul Branco began discussions with Stewart Applebaum to sell the GACC assets to Applebaum's company, Brooktenn, LLC. Applebaum was already the owner of several GACC franchises, and he was interested in obtaining a new, independent lease for Brooktenn at the location the Brancos occupied in the Sumter Mall.

On March 1, 2013, an asset purchase agreement was entered into between Branco Investments and Brooktenn for Brooktenn to buy the GACC assets for $70,000. Paul Branco and Applebaum signed on behalf of their companies. The document made the purchase "contingent upon Buyers [Brooktenn] getting a satisfactory lease from [the Sumter Mall's leasing agent] within 90 days of [the] signed proposal."[1] The asset sale ultimately fell through, however, after the leasing

---

[1] The agreement also contained a separate provision for Brooktenn to purchase the assets in a GACC store located at the Magnolia Mall in Florence for $30,000.

agent tried to impose a substantial "lease assignment fee" (on either the Brancos or Brooktenn), despite the fact that the Brancos were not assigning their lease to Brooktenn.

Lewis White, an employee of the Sumter Mall's leasing agent, the Hull Storey Retail Group, LLC ("Hull Storey"), was the person primarily responsible for negotiating with the parties. It is undisputed that Applebaum's application for a lease on behalf of Brooktenn was approved by the Sumter Mall. In addition, according to Applebaum, he had a new, independent lease of the premises in the name of Brooktenn "in place," although a document had not been signed. No mention was made at that time of a lease assignment.[2] Rather, the point came up only after Hull Storey could not extract a "lease assignment fee" from the Brancos.

During White's negotiations, he, along with Hull Storey, repeatedly insisted that the Brancos were attempting to assign their lease to Brooktenn, which they maintained triggered a provision in the Brancos' existing lease governing assignments. That provision required the Brancos to pay over to the Sumter Mall *all* consideration received in connection with an assignment—in this case, the full $70,000 in proceeds from the sale of the GACC assets.[3]

In response, the Brancos asserted their ten-year lease was about to expire, so they were not, in fact, attempting to assign their lease. Rather, they were allowing their lease to expire at the conclusion of their ten-year term and selling their GACC assets, and Brooktenn was seeking a new, independent lease of the mall location. The Brancos refused to pay the "lease assignment fee" on the ground the provision was not applicable.

When that effort failed, Hull Storey reduced the amount demanded to $20,000, and it attempted to collect this sum from *either* the Brancos or Brooktenn.

---

However, after a dispute arose over the Sumter Mall location, the parties allowed the entire agreement to expire.

[2] Applebaum later testified in the trial of this matter: "[T]hey knew I wasn't taking Paul's [Paul Branco's] lease because I [Brooktenn] *had a new lease*. We already had discussed it and *that was in place*. There was nothing [said] about an assignment." (Emphasis added.)

[3] "If Tenant assigns its interest in this Lease, all consideration payable to Tenant in conjunction with such assignment shall be payable and belong to Landlord."

On April 30, 2013, the last day of the Brancos' lease, White emailed both Paul Branco and Applebaum several items, including (1) a proposed lease assignment, and (2) a letter from Hull Storey's attorney offering the Brancos an extension of their existing lease until May 15, 2013 (presumably to allow time to finalize the negotiations).

The first document, a proposed "Assignment, Assumption, Amendment and Ratification of Lease Agreement," set forth specific lease terms for Brooktenn, and indicated the monthly rent would increase incrementally over ten years from $3,200 in 2013 to $3,800 in 2023. However, the document also included language stating the Brancos were (purportedly) agreeing to "sell the business" to Brooktenn for $70,000, which Hull Storey described as an "Assignment Cost," and that, pursuant to the Brancos' original lease, the $70,000 "Assignment Cost" was "payable entirely to" the Sumter Mall, but the Sumter Mall had agreed to accept $20,000 "as full *satisfaction of its entitlement to* the Assignment Cost." (Emphasis added.) The second document, the offer for a short extension of the Brancos' lease, stated it would be effective upon the signing of the "Tenant."

The Brancos signed the letter on May 3, 2013, accepting the extension of their lease until May 15, 2013. However, the Brancos and Applebaum reiterated to White that the Brancos' lease was expiring and was not being assigned, so no fee was due under the assignment provision in the Brancos' (expiring) lease. Neither the Brancos nor Brooktenn ever signed the proposed lease assignment, as the parties could not resolve the dispute regarding Hull Storey's repeated demand for an additional, one-time fee of $20,000 over and above the amount of the lease payments.

Notably, during the course of these discussions, after Applebaum balked at the Sumter Mall's alleged "entitlement" to an assignment fee, White informed Applebaum that the Brancos likely would not be able to remove the GACC assets from their store, so Applebaum could wait for the Brancos' lease to expire, pay Hull Storey the $20,000 fee, lease the store for Brooktenn with the equipment still inside, *not* pay the Brancos the $70,000 for the GACC assets, and come out of the deal $50,000 ahead. Applebaum strongly rejected this scheme to disavow the asset purchase agreement and undercut the Brancos, and he refused to sign the lease for the Sumter Mall location. As a result, the sale of the GACC assets did not occur. The Brancos moved out of their store on May 15, 2013, the end date of their lease extension.

Petitioners (Branco and his company) subsequently brought this action against Respondents (the mall and its agent), alleging multiple causes of action regarding

the loss of the asset sale. Following a bench trial, the trial court ruled in favor of Petitioners on their claim of tortious interference with a contract. The trial court found, *inter alia*, that Respondents' "repeated prodding" and demand for an (inapplicable) lease assignment fee, and its suggestion that Brooktenn could pay the fee, move in, and avoid paying for the GACC assets, "caused Brooktenn to walk away from the asset sale contract." The trial court concluded "Hull Storey's interference with the asset sale contract was not justified, and [it] was carried out through improper means," citing *Love v. Gamble*, 316 S.C. 203, 215, 448 S.E.2d 876, 883 (Ct. App. 1994) (observing unethical conduct, sharp dealing, overreaching, and unfair competition may all constitute improper methods of competition). The trial court determined Petitioners' loss of the $70,000 contract price should be offset by Branco's sale of some of the equipment for $5,000 and for unpaid rent of $1,375, resulting in actual damages of $63,625. The trial court found the burden of proof had not been met as to all remaining claims, including the Sumter Mall's counterclaims.

The court of appeals reversed, holding Petitioners could not recover on their tort claim because there was no "valid, enforceable contract with which [Respondents] could have interfered." *Branco*, 2021 WL 118536, at *1.

## II.

A claim for tortious interference with a contract that seeks monetary damages is an action at law. *See generally Longshore v. Saber Sec. Servs., Inc.*, 365 S.C. 554, 560, 619 S.E.2d 5, 9 (Ct. App. 2005) ("An action in tort for damages is an action at law."). "[W]here a law case is tried by a judge without a jury, his findings of fact have the force and effect of a jury verdict upon the issues, and are conclusive upon appeal when supported by competent evidence." *Chapman v. Allstate Ins. Co.*, 263 S.C. 565, 567, 211 S.E.2d 876, 877 (1975); *see also Meredith v. Mt. Pleasant Boat Bldg. Co.*, 286 S.C. 115, 116, 333 S.E.2d 565, 565 (1985) ("In an action at law tried non-jury, the trial judge's findings of fact will not be disturbed [on appeal] if there is any evidence to reasonably support [the judge's] findings.").

## III.

Petitioners argue that, in reversing the trial court, the court of appeals disregarded evidence in the record that supports a claim for tortious interference with a contract because the court of appeals weighed one fact—the existence of a contingency clause in the asset purchase agreement with Brooktenn—more heavily than the evidence as a whole. Petitioners contend evidence in the record shows the

parties had a contract that was subjected to improper interference by Respondents, so the court of appeals exceeded its scope of review by failing to uphold the trial court's findings in this regard. Petitioners also assert the court of appeals improperly considered a defense (the statute of frauds) in making its decision to reverse the trial court's ruling. We agree with Petitioners' assertions.

To establish a cause of action for tortious interference with contractual relations, a plaintiff must show: (1) the existence of a contract, (2) knowledge of the contract, (3) the intentional procurement of its breach,[4] (4) the absence of justification, and (5) resulting damages. *Eldeco, Inc. v. Charleston Cnty. Sch. Dist.*, 372 S.C. 470, 480, 642 S.E.2d 726, 731 (2007); *see also Kinard v. Crosby*, 315 S.C. 237, 240, 433 S.E.2d 835, 837 (1993) (reciting these elements); *Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993) (same); *cf.* Restatement (Second) of Torts § 766 (Am. L. Inst. 1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.").

The tort reflects the public policy that contract rights are property and, therefore, subject to protection from improper interference that exceeds the realm of fair competition. 44B Am. Jur. 2d *Interference* § 36 (2017). It is not necessary that the interfering party intend the harm; rather, it is only necessary that the party intend to interfere with an existing contract. *Eldeco, Inc.*, 372 S.C. at 481 & n.5, 642 S.E.2d at 732 & n.5 (citing, *inter alia*, W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* §§ 129–130 (5th ed. 1984)).

This appeal concerns the first element of the tort: the existence of a contract. The court of appeals found no action could lie for tortious interference with a contract in the current matter because the asset purchase agreement contained an unsatisfied condition precedent (i.e., Brooktenn obtaining a "satisfactory lease" of the mall premises). The court of appeals found the condition was not satisfied

---

[4] We have recognized there are some circumstances where a technical breach of the contract may be excused. *See, e.g., Hall v. UBS Fin. Servs. Inc.*, 435 S.C. 75, 88–92, 866 S.E.2d 337, 343–45 (2021) (holding an at-will employment contract can be the subject of a claim for tortious interference with a contract, even though terminating an at-will employee does not result in a breach of the contract).

because Applebaum never signed a written lease[5] with Respondents due to the dispute over the lease assignment fee. Consequently, the court of appeals determined the asset purchase agreement never ripened into "a 'valid, enforceable' contract" that could be the subject of a claim for tortious interference with a contract, citing *Jackson v. Bi-Lo Stores, Inc.*, 313 S.C. 272, 277, 437 S.E.2d 168, 171 (Ct. App. 1993) ("The right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid, enforceable contract.").

The court of appeals further relied upon a case from this Court stating a valid contract is a crucial element of the claim. *See Chitwood v. McMillan*, 189 S.C. 262, 266, 1 S.E.2d 162, 164 (1939) ("Before any question of liability for procuring a breach of contract arises, certain necessary factors and elements must appear—the first of which is *the existence of a valid contract*." (emphasis added)). In *Chitwood*, this Court held that a contractor's failure to satisfy a condition precedent in his contract with the highway department—the condition that he first obtain the written approval of the State Highway Commissioner (and submit certain documents) before entering into any subcontracts—rendered his attempt to subcontract a portion of the project invalid. The Court held, in relevant part, that the subcontract was not a valid contract subject to a claim of tortious interference because its validity was dependent upon securing the Commissioner's written consent, and this *authority to enter into a subcontract* was never sought nor obtained. *See id.* at 266–67, 1 S.E.2d at 164.

Although in the current matter the court of appeals concluded it was constrained by the contingency clause to hold there was no contract that could be subject to interference, it described Respondents' conduct as "an underhanded and deceitful way to conduct business." *Branco*, 2021 WL 118536, at *5. We agree with its characterization of Respondents' conduct, but we disagree that the presence of the contingency clause (which could be invoked by Applebaum in his sole discretion for his own protection) precludes Petitioners' claim here for tortious interference with the contract.

---

[5] The court of appeals noted the statute of frauds required the lease of real property in excess of one year to be in writing. *See* S.C. Code Ann. § 27-35-20 (2007); *id.* § 32-3-10(4). Petitioners contend no issue was preserved as to the statute of frauds. While we find the issue was arguably preserved, we need not consider it further because whether Brooktenn obtained a written lease does not alter our conclusion that the trial court correctly found Respondents tortiously interfered with the GACC asset purchase agreement.

As an initial matter, we find the case of *Bi-Lo Stores, Inc.* is distinguishable from the current appeal, as it involves a contract that was void and never enforceable because it was illegal, thus precluding a claim for tortious interference. *See Bi-Lo Stores, Inc.*, 313 S.C. at 277–78, 437 S.E.2d at 171 ("A contract which contravenes public policy is void, and an action cannot be maintained for either its breach or for inducing its breach.").

We also find *Chitwood* is not determinative. In the current appeal, Petitioners undoubtedly had *the authority* to enter into a contract with Brooktenn, as the expiring store lease between the Brancos and Respondents contained no prohibition against them selling or removing their own property from the premises. Thus, the validity of the contract was not in dispute. Respondents themselves conceded at the oral argument before this Court that Branco Investments did have a viable "contract" with Brooktenn. Nevertheless, Respondents urged this Court to find there was no contract that could be subjected to interference, reasoning that the contract was not enforceable because the contingency for a "satisfactory lease" was not met, so no improper interference could occur.

The ability of one party to a contract to avoid it based on a *proper* ground, if the party *elects* to do so, does *not* mean that any third person is free to tortiously interfere with the parties' contract for an *improper* purpose. *See* Restatement (Second) of Torts § 766 cmt. f (Am. L. Inst. 1979) (explaining "[a] promise may be a valid and subsisting contract even though it is voidable"). Defenses to enforcement of a contract, such as the existence of conditions precedent, are for the benefit of the contracting parties, and they do not afford a right to others to engage in tortious interference with impunity:

> The third person may have a defense against [an] action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly. Thus, by reason of the statute of frauds, formal defects, lack of mutuality, infancy, unconscionable provisions, *conditions precedent to the obligation* or even uncertainty of particular terms, the third person may be in a position to avoid liability for any breach. The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.

*Id.* (emphasis added).

Brooktenn's obligation to perform (to purchase the GACC assets) was contingent on obtaining a "satisfactory lease," a circumstance that is subjective. It is a condition precedent to an obligation of *performance*, not a condition precedent to the *formation* of a valid contract. *See M West, Inc. v. Oak Park Mall, L.L.C.*, 234 P.3d 833, 843 (Kan. Ct. App. 2010) (stating courts usually recognize two kinds of conditions precedent; conditions precedent to performance arise from the terms of a valid contract and define events that must occur before a right or obligation matures under the contract, while conditions precedent to the formation of a contract involve issues of offer and acceptance that precede and determine the formation of a contract); 13 Richard A. Lord, *Williston on Contracts* § 38:4, at 422 (4th ed. 2013) ("The fact that no duty of performance on either side can arise until the happening of the condition does not, however, make the validity of the contract depend on its happening."). Thus, the asset purchase agreement remained valid and enforceable by Brooktenn until such time as Brooktenn elected to disavow it. *See generally Park v. Lyons*, 219 S.C. 40, 47–49, 64 S.E.2d 123, 126–27 (1951) (observing that, although a contract is voidable by one party, it remains binding on the other party until it is disavowed).

Petitioners essentially contend the condition that Brooktenn obtain a "satisfactory lease" would have been completed *but for* the tortious interference of Respondents. Although we, as did the trial court, recognize that Respondents are free to set their own rental prices, they did not simply do that. Rather, Respondents approved a lease application from Brooktenn, and then negotiated a lease, which was reportedly "in place," but not signed, so Applebaum apparently had reached some kind of satisfactory point in the negotiations. Once Respondents became aware of the pending asset sale, however, they essentially devised a plan to grab all ($70,000) or some ($20,000) of the proceeds of the sale for themselves by repeatedly and falsely insisting they were entitled to a lease assignment fee under the Brancos' existing lease, despite all evidence to the contrary.[6] In addition, they suggested that Applebaum could pay them the $20,000 fee, move into the premises, and keep the GACC assets without paying Branco Investments. To his credit, Applebaum strenuously objected to this scheme, stating he did not do business that way and would never "stab" the Brancos in the back by taking their property without paying for it. Applebaum did, however, exercise his right under the contract not to purchase

---

[6] Respondents notably acknowledged at oral argument that, in "hindsight," it is clear to them that no assignment was ever attempted by the parties.

the GACC assets when Respondents thwarted his attempt to procure an independent lease of the premises.

The *Chitwood* Court, in discussing the lack of a valid contract there, stated there had been no allegation that the respondent had *interfered with* the ability of the contractor *to meet the necessary conditions* for the contractor to enter into a valid subcontract with the appellant (i.e., obtaining authorization from the State Highway Commissioner and submitting certain documentation). *See Chitwood*, 189 S.C. at 265, 1 S.E.2d at 163 ("Nor did he [the appellant] offer to prove that these things *would have been done but for the interference* of the respondent." (emphasis added)). In contrast, it is abundantly clear from the evidence in the record and the findings of the trial court in Petitioners' case that Respondents improperly interfered with the asset purchase agreement and, more precisely, the ability of Brooktenn to satisfy the condition precedent to performance of the contract.

## IV.

There is no doubt that Respondents knew their actions could have an adverse impact on Petitioners' planned sale of the GACC assets. For example, the Sumter Mall's attorney emailed Paul Branco after Branco disputed that the $70,000 in sales proceeds (or any portion thereof) was owed to Respondents: "I understand you're in [the] process of trying to sell the business and I hate for this small amount *to hold up the deal*." (Emphasis added.) As the trial court found, Respondents' "repeated prodding" ultimately caused Brooktenn to walk away from the contract, resulting in damages to Petitioners from the lost sale. Respondents' explanation that they were simply pursuing their own business interests is neither adequate nor compelling.[7]

For all of the foregoing reasons, we conclude the evidence in the record supports the trial court's findings and its ruling in favor of Petitioners on their claim of tortious interference with contractual relations. Consequently, we reverse the decision of the court of appeals.

**REVERSED.**

---

[7] *See generally Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462–63 (Mich. Ct. App. 1989) ("A defendant may not, with impunity, sabotage the contractual agreements of others, and [a] defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right. On the contrary, the defendant's motive is but one of several factors which must be weighed in assessing the propriety of the defendant's actions.").

**BEATTY, C.J., KITTREDGE, FEW, JAMES, JJ., and Acting Justice Aphrodite K. Konduros, concur.**