RCDI CONSTRUCTION, INC., and RCDI Construction Management, Inc., Plaintiff,

v.

SPACEPLAN/ARCHITECTURE, PLANNING & INTERIORS, P.A.; and G. Carroll Hughes, Defendants.

CIV. No. 1:00CV177.

United States District Court, W.D. North Carolina, Asheville Division.

April 20, 2001.

George Ward Hendon, Martin K. Reidinger, Adams, Hendon, Carson, Crow & Saenger, Asheville, NC, Thomas E. Crafton, Crafton, Martin, Ogburn & Zipperle, Louisville, KY, for Plaintiff.

M. Charles Cloninger, Frederick S. Barbour, McGuire, Wood & Bissette, P.A., Asheville, NC, for Defendant.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the parties' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, this Court referred Defendant's motion to dismiss and motion for judgment on the pleadings to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review of the Magistrate Judge's recommendation, the Court grants the Defendant's motion for judgment on the pleadings with respect to each of Plaintiff's claims; for tortious interference with contract; for unfair and deceptive trade practices; for tortious interference with prospective economic advantage; and for Plaintiffs' claim for negligence.[1]

### I. STATEMENT OF FACTS

In November 1995, Plaintiff RCDI Construction Management, Inc. ("RCDI–CM"), signed a contract with Dr. Anjil Patel for the construction of a hotel in Buncombe County, North Carolina. *See* Complaint, ¶ 10. The contract was assigned in 1996 to Plaintiff RCDI Construction, Inc. ("RCDI"), a wholly owned subsidiary of RCDI–CM, and Plaintiffs undertook to construct the hotel. *See id.* Construction was nearly completed in 1997 when a catastrophic discharge of water occurred within the hotel. *Id.,* ¶ 13. Plaintiffs thereafter attempted to identify the cause of the water discharge and to take remedial actions. *Id.,* ¶ 14.

Plaintiffs were prevented from doing so, however, by Dr. Patel. *Id.,* ¶¶ 18, 23. Dr. Patel barred Plaintiffs from the hotel work site on the advice of Defendants, who advised Dr. Patel to take such action in order to allow Defendants an opportunity to assess the condition of the building and develop a recommended course of action. *Id.* During that time, no remedial action was taken to prevent further damage from occurring due to the water discharged in the hotel. *Id.,* ¶¶ 17–18. Defendants offered said advice to Dr. Patel even though they were not the original architects of the building or parties to the construction. *See id.,* ¶¶ 15–18. Dr. Patel thereafter retained Defendants to recommend and

---

1. Because the Court grants Defendants' motion for judgment on the pleadings with respect to each of Plaintiffs' claims, the Court need not consider whether said claims are barred by a release executed in the course of a settlement of a previous lawsuit.

oversee a course of remedial action to be taken with respect to the hotel. *Id.*, ¶ 19. Pursuant to their employment by Dr. Patel, Defendants recommended that Dr. Patel terminate the Plaintiffs, gut the building due to water damage and toxic mold infestation, and reconstruct the hotel. *Id.*, ¶¶ 21–25.

Following their termination, Plaintiffs instituted a civil action against Dr. Patel. *Id.*, ¶ 29. Dr. Patel counterclaimed alleging breach of contract and failure to remedy defects in the hotel. *Id.* A settlement was reached in that suit whereby Plaintiffs were unable to recover a $421,000 balance owed to them under the construction contract, and Dr. Patel received the sum of $6,700,000 in compensation. *See id.*, ¶ 39; Plaintiffs' Memorandum in Opposition to Defendant's [Motions], at 3.

This action followed.

## II. STANDARD OF REVIEW

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir.1992) (citations omitted). The motion should not be granted unless it appears that the plaintiff can prove no set of facts that would entitle him to relief. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). Moreover, in considering the facts of the case for purposes of ruling on the Defendant's motion, the Court will view the pleadings and materials presented in the light most favorable to the Plaintiff, as the nonmoving party, assuming all factual allegations to be true. *See, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Mylan Labs, supra.* However, the Court need not accept as true "the legal conclu-

sions drawn from the facts ... [or] unwarranted inferences, unreasonable conclusions, or arguments[.]" *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir.2000).

This Court "applies the same standard under Rule 12(c) as it applies under [ ] Rule 12(b)(6)." *Razor v. Perdue Farms, Inc.*, 176 F.3d 475, 1999 WL 178782, *1 (4th Cir.1999) (*citing Gustafson v. Jones*, 117 F.3d 1015, 1017 (7th Cir.1997)); 2 *Moore's Federal Practice*, § 12.38 (3d ed.2001) (a motion to dismiss filed after the defendant has filed an answer will be treated as a motion for judgment on the pleadings, though "any distinction between them is merely semantic because the same standard applies to motions made under either subsection.").

## III. DISCUSSION

### A. Tortious Interference with Contract

The elements necessary to establish a cause of action for tortious interference with a contract under North Carolina law are summarized in the seminal case of *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954):

> [T]he plaintiff must allege and prove these essential elements of the wrong: First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

240 N.C. at 674, 84 S.E.2d at 181–82 (internal citations omitted). "The theory of the

doctrine which permits recovery for the tortious interference with a contract is that the right to the performance of a contract and to reap the profits therefrom are property rights which entitle each party to protection and to seek compensation by action in court for an injury to such contract." *Carolina Overall Corp. v. East Carolina Linen Supply, Inc.*, 8 N.C.App. 528, 531, 174 S.E.2d 659, 661 (1970).

Here, Plaintiffs' claim fails because they cannot satisfy the first element of the offense. While there is no question that a contract for the construction of a hotel was signed by RCDI–CM and Dr. Patel, it is equally uncontested that Plaintiff RCDI–CM was not a contractor licensed by the State of North Carolina at the time of the signing of the contract. *See* Complaint, ¶ 10; Plaintiffs' Memorandum in Opposition, at 11–12; Defendant's Reply Brief and Brief in Response to Plaintiffs' Motion to Amend, at 1; Affidavits of Mark D. Selph, *attached to* Amendment to Answer and In the Alternative, Motion to Amend Answer. Notwithstanding Plaintiffs' bare assertions to the contrary, "contracts entered into by unlicensed construction contractors, in violation of a statute passed for the protection of the public, [*see, e.g.*, N.C. Gen.Stat. §§ 87–1, 87–13], are unenforceable by the contractor." *Brady v. Fulghum*, 309 N.C. 580, 583, 308 S.E.2d 327, 330 (1983); *Jenco v. Signature Homes, Inc.*, 122 N.C.App. 95, 99, 468 S.E.2d 533, 535 (1996) (citing *Brady* for the proposition that "contracts entered into by unlicensed contractors are unenforceable by the contractor."); *Hawkins v. Holland*, 97 N.C.App. 291, 293, 388 S.E.2d 221, 222 (1990) (refusing to allow an unlicensed contractor to enforce a construction contract; "[O]ur courts will not enforce a contract that the law forbids."); *Dellinger v. Michal*, 92 N.C.App. 744, 746, 375 S.E.2d 698, 699 (1989) ("Thus, a contract entered into by an unlicensed contractor is illegal and unenforceable."). "The unenforceabilty of such contracts by the contractor stems directly from their conception in the contractor's illegal act." *Brady*, 309 N.C. at 584, 308 S.E.2d at 330.[2] Thus, because Plaintiffs possessed no contractual rights to enforce against the other party to the contract (Dr. Patel),[3] a related claim for tortious interference with contract will not be recognized by the courts. *See, e.g.*, Restatement (Second) of Torts § 774 (1979) (there is no liability for a third party causing the breach of an illegal contract); *American Private Line Servs., Inc. v. Eastern Microwave, Inc.*, 980 F.2d 33, 35–36 (1st Cir. 1992) (no claim for contractual interference, as a matter of law, where there was no enforceable contract); *NCH Corp. v. Share Corp.*, 757 F.2d 1540, 1543 (5th Cir.

**2.** In addition to the general rule "that a contract illegally entered into by an unlicensed general construction contractor is unenforceable by the contractor[,]" the contract "cannot be validated by the contractor's subsequent procurement of a license." *Brady*, 309 N.C. at 586, 308 S.E.2d at 331.

**3.** Plaintiff's assertion that the "unlicensed contractor contracts" remain "fully enforceable," save for any right to affirmative recovery under them, is meritless. As quoted *supra*, the North Carolina courts have unequivocally stated that said contracts are *"unenforceable."* The only party vested with any contract-rights under the illegal contract is the innocent party who retained the unlicensed contractor. *Brady*, 309 N.C. at 586, 308 S.E.2d at 332. Indeed, "[i]t is well settled in North Carolina that a general contractor ... who has no license may not recover for the owner's breach of the contract, or for the value of the work and services furnished or materials supplied under the contract on the theory of unjust enrichment." *Harrell v. Clarke*, 72 N.C.App. 516, 517, 325 S.E.2d 33, 34 (1985) (citation omitted).

**614**

1985) (no claim for tortious interference with contract "where a contract is void as illegal or against public policy."); *Barnes Group, Inc. v. C & C Products, Inc.,* 716 F.2d 1023, 1027 (4th Cir.1983) ("[A] necessary element of the tort of intentional interference with contract is that the contract at issue be valid and enforceable as between the parties to it."); *Advance Indus. Sec., Inc. v. William J. Burns Int'l Detective Agency, Inc.,* 377 F.2d 236, 238 (5th Cir.1967) (Because the "right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid enforceable contract[,]" recovery will be denied where a claim is founded upon "contracts which are void as against the public policy of the state."); *American Prop. Consultants, Ltd. v. Walden Lisle Assoc.,* 1997 WL 394617, *10 (S.D.N.Y.1997) (citing the Second Circuit's holding that under New York law there is "no cause of action for inducement of breach when an action on the underlying brokerage contract is barred by reason of the participation of an unlicensed co-broker."); *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A.,* 18 S.W.3d 706, 713 (Tex.App.2000) ("Similarly, a contract that is illegal ... cannot be interfered with."); *PMC, Inc. v. Saban Entertainment, Inc.,* 45 Cal. App.4th 579, 600–01, 52 Cal.Rptr.2d 877 (1996) (plaintiff must have right to enforce underlying contract for a cause of action for tortious interference to exist); *East Penn Sanitation, Inc. v. Grinnell Haulers, Inc.,* 294 N.J.Super. 158, 180, 682 A.2d 1207, 1218 (1996) ("It is also generally recognized that it is not tortious interference to cause the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy." (citations omitted)); *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 194, 428 N.Y.S.2d 628, 406

N.E.2d 445, 451 (1980) (absent fraud or threats, "no liability has resulted to one whose actions have induced nonperformance of a contract deemed to be voidable and thus unenforceable[.]"); *Wedgewood Carpet Mills, Inc. v. Color–Set, Inc.,* 149 Ga.App. 417, 421, 254 S.E.2d 421, 424 (1979) ("In order for [Plaintiff] to recover for unlawful interference with its contractual relations with [a third party], there must have been an enforceable contract existing between the parties."); *Jolma v. Steinbock,* 40 Or.App. 657, 667–68, 596 P.2d 980, 986 (1979) ("While it is clear that one who intentionally interferes with the performance of a contract between two or more persons by causing one of the parties not to perform may be held liable in tort, [ ] there is no liability where, as here, the contract is void or contrary to public policy.").

█ Though this result is harsh, it is "consistent with the position taken by the courts that despite possible injustice resulting between the parties, they will not lend their assistance to a party who seeks compensation [stemming from] an illegal act." *Bryan Builders Supply v. Midyette,* 274 N.C. 264, 273, 162 S.E.2d 507, 513 (1968) (quotations omitted); *Hall v. Simmons,* 329 N.C. 779, 782–83, 407 S.E.2d 816, 818 (1991) (stating that North Carolina has "adopted a 'bright line' rule requiring strict compliance with the licensing provisions of N.C. Gen.Stat. [§ 87–1,]" "to protect members of the general public without regard to the impact upon individual contractors." (citations omitted)). This rule is consistent with the "well founded policy of law that no person be permitted to acquire a right of action from their own unlawful act and one who participates in an unlawful act cannot recover damages for the consequences of that act. This rule applies at both law and in equity and

whether the cause of action is in contract or in tort." *Jackson v. Bi–Lo Stores, Inc.,* 313 S.C. 272, 276, 437 S.E.2d 168, 170 (1993) (internal citations omitted). Indeed,

> [t]he illegality doctrine has also been recognized by the United States Supreme Court which, in *McMullen v. Hoffman,* 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117, [ ] held illegality as a defense to a contract action:

>> The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract.

> *Id.,* at 654[ ], 19 S.Ct. 839.

*Bi–Lo Stores,* 313 S.C. at 276, 437 S.E.2d at 170.

■ Plaintiffs argue that the contract was valid and legal for a number of reasons, none of which are convincing. First, Plaintiffs argue that they are not unlicensed contractors because RCDI–CM was licensed in West Virginia at the time the contract was signed with Dr. Patel, and RDCI was "properly licensed in North Carolina throughout the construction." Memorandum in Opposition, at 11. By the plain terms of the North Carolina licensing statute, RCDI–CM was and is not properly licensed. Section 87–10 of the North Carolina General Statutes provides for the examination of anyone seeking to be licensed as a general contractor in the State of North Carolina. Certificates are issued to properly licensed contractors as proof of their having been granted the "right[ ] and privilege[ ]" to serve as a contractor in North Carolina. N.C. Gen.Stat. § 87–12. Where a contractor duly licensed in anoth-

er state seeks to practice in North Carolina, he or she must apply to the licensing Board, which "in its discretion may grant licenses ... to general contractors licensed by other states, without written examination[.]" N.C. Gen.Stat. § 87–15.1. Plaintiff RCDI–CM does not, and cannot, assert that it was granted a license to practice in North Carolina pursuant to the "reciprocity of licensing" requirements found in the statute. *See id.;* Affidavits of Mark D. Selph, *attached to* Amendment to Answer and In the Alternative, Motion to Amend Answer. Plaintiff RCDI–CM, then, invites the Court to ignore the express provisions of the statute. This the Court cannot do: "The rules of statutory construction require presumptions that the legislature inserted every part of a provision for a purpose and that no part is redundant. [S]ignificance and effect should, if possible, ... be accorded every part of the act, including every section, paragraph, sentence or clause, phrase, and word." *Hall,* 329 N.C. at 784, 407 S.E.2d at 818 (citations omitted). Thus, Plaintiff RCDI–CM was not properly licensed, and could not legally have entered into a construction contract within the State of North Carolina. *See, e.g., Brady,* 309 N.C. at 585–86, 308 S.E.2d at 331; N.C. Gen.Stat. § 87–13.

■ Similarly, Plaintiff's assertion that the contract is "saved" because the party which actually constructed the hotel was licensed in North Carolina at all times during construction is devoid of merit. When assessing the legality of a construction contract, "the existence of a license at the time the contract is signed is determinative[.]" *Brady,* 309 N.C. at 586, 308 S.E.2d at 331. "Moreover, the contract cannot be validated by the contractor's subsequent procurement of a license." *Jenco,* 122 N.C.App. at 99–100, 468 S.E.2d at 535 (*citing Brady, supra.*). Similarly, the assignment of a contract from an unli-

censed contractor to a properly licensed contractor *"[does] not cure the illegal contract* which existed at the time that the contract was signed." *Id.* (emphasis added). There is no question that RCDI was not an original party to the contract, but even if they had been, the contract would still be illegal. *Hawkins,* 97 N.C.App. at 294, 388 S.E.2d at 222 (Even where one of two contractors in partnership was properly licensed, the contracts were still illegal and unenforceable because the partnership did not have a general contractor's license.); *Joe Newton, Inc. v. Tull,* 75 N.C.App. 325, 330 S.E.2d 664 (1985) (Even though company president had a contractor's license, the company was an unlicensed contractor in violation of the statute.).

Second, Plaintiff's reliance on *Haskins v. Royster,* 70 N.C. 601, 1874 WL 2475 (1874), for the proposition that unlicensed contractors who, in violation of the law, enter into construction contracts may recover for tortious interference with contract is entirely misplaced: (1) *Haskins v. Royster* does not stand for the proposition for which Plaintiffs cite it. The passage relied upon by Plaintiffs states:

> I admit that it is of much importance to the best interests of society that valid contracts of every kind, and especially those between employers and laborers, should be observed in good faith; and that officious intermeddlers should find no favor. But it is a rule of common sense, that what one may lawfully do, another may advise him to do. Yet I admit that there is respectable authority for saying, that where there is a voidable contract which one may violate with impunity, if a third person induces him to violate it, he may be liable.

70 N.C. at ——, 1874 WL 2475, at *13. Thus, by its own terms the passage does not establish a rule of law. (2) The passage relied upon is a portion of the *dissent.* Thus, even if it did stand for the proposition for which Plaintiffs urge, it would not be binding on other North Carolina courts. Moreover, the dissent urged that the *Haskins* Court *decline* to find tortious interference on the ground, *inter alia,* that the employment contracts were unconscionable. (3) The issue addressed in *Haskins* was whether inducing at-will employees to breach their employment contracts was actionable. The *Haskins* Court did not even consider, much less opine on, whether an unlicensed contractor party to an illegal contract could bring an action for tortious interference with contract.[4] (4) This Court, like all other courts applying North Carolina law, is bound to follow the state of the law as it now stands, not as it might have stood some 125 years ago. Here, the Supreme Court of North Carolina in *Brady*—an opinion issued in 1983—held unambiguously that contracts entered into by unlicensed contractors may not be enforced by the contractor, as they are illegal and violative of public policy. *See Brady,* 309 N.C. at 585–86, 308 S.E.2d at 331. This holding has been faithfully followed by the courts of North Carolina, and is binding on this Court. *See, e.g., Jenco,* 122 N.C.App. at 99–100, 468 S.E.2d at 535–36; *Hawkins,* 97 N.C.App. at 293–94, 388 S.E.2d at 222; *Dellinger,* 92 N.C.App. at 746, 375 S.E.2d at 699.

---

4. The North Carolina Supreme Court has subsequently explained that in *Haskins* the "Court recognized the principle that a master could not discharge his servant in bad faith." *Coman v. Thomas Mfg. Co.,* 325 N.C. 172, 176–77, 381 S.E.2d 445, 448 (1989); *see also Peoples Sec. Life Ins. Co. v. Hooks,* 86 N.C.App. 354, 356, 357 S.E.2d 411, 413 (1987) (explaining that the *Haskins* Court refused to recognize a "claim for hiring or recruiting another employer's employees whose employment contract is terminable at will.").

Defendant's motion for judgment on the pleadings with respect to Plaintiffs' claim for tortious interference with contract will be granted.

## B. Tortious Interference with Prospective Economic Advantage [5]

"In order to maintain an action for tortious interference with prospective [economic] advantage, plaintiff must show that defendants induced [a third party] to refrain from entering into a contract with plaintiff without justification. Additionally, plaintiff must show that the contract would have ensued but for the defendants' interference." *Dalton v. Camp*, 138 N.C.App. 201, 211, 531 S.E.2d 258, 265 (2000) (citations omitted).

Here, Plaintiffs allege that "Defendants interfered with Plaintiffs' freedom of contract by acting to prevent RCDI from correcting the work and curing the mold infestation." Memorandum in Opposition, at 16. Though Plaintiffs maintain that a valid contract existed at all times between themselves and Dr. Patel, they claim that "even if there was some defect in their 'validity,' Plaintiffs had a reasonable contractual expectancy to be able to correct problems with the building." *Id.*, at 17. The fallacy of Plaintiffs' proffered reasoning is palpable. As the Court explained *supra*, Plaintiffs' contract with Dr. Patel was illegal and unenforceable. As a matter of law, Plaintiffs do not possess a contract right to correct defects in the construction after having been properly terminated by the innocent party to the illegal contract any more than they have a right to recover for their time and the cost of the building materials. Plainly, inducing someone to lawfully refuse access to a private building cannot be equated with improperly inducing someone to refrain from entering into a contract. The failure of Plaintiffs to allege two essential elements of the cause of action, namely (1) that Defendants induced Dr. Patel to refrain from entering into a new, legal contract with Plaintiffs, and (2) that a legal contract would have ensued but for Defendants' actions, is fatal to this cause of action. *See Dalton*, 138 N.C.App. at 211, 531 S.E.2d at 265. Thus, by the very terms of Plaintiffs' allegations, a cause of action for tortious interference with prospective economic advantage cannot be maintained.

## C. Unfair Trade Practices

To prevail on a claim of unfair and deceptive trade practice a [claimant] must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the [claimant] or to his business. A [trade] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Additionally, a party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position. The question of whether a particular practice is unfair or deceptive is a legal one, reserved for the court.

*Market America, Inc. v. Christman–Orth*, 135 N.C.App. 143, 155–56, 520 S.E.2d 570, 579 (1999), *rev. denied*, 351 N.C. 358, 542 S.E.2d 213 (2000) (internal quotations and citations omitted). "[P]rofessional services rendered by a member of a learned profes-

---

**5.** Though there is no record evidence that the Magistrate Judge granted Plaintiffs' motion to amend their complaint and add this new cause of action, the Court will nonetheless address the issue.

sion" are exempted from the purview of the unfair trade practices act. N.C. Gen. Stat. § 75–1.1(b).

 Plaintiffs object to the Magistrate Judge's recommendation that this Court find (1) that Defendants come within the "learned profession" exception to the North Carolina unfair trade practices statute, and (2) that Defendants were rendering "professional services" within the meaning of the act. Because the legislature does not specifically define what professions are considered "learned," the courts must look to whether a particular profession has traditionally been considered a learned profession. *See Reid v. Ayers*, 138 N.C.App. 261, 266, 531 S.E.2d 231, 235 (2000); *see generally O'Brien v. O'Brien*, 131 N.C.App. 411, 420, 508 S.E.2d 300, 306 (1998) (If an issue "has not been previously addressed in North Carolina[,]" the Court should "look to other jurisdictions for guidance."). Though there was a time when the "learned professions" were limited to the practice of medicine, law, and theology, *see, e.g., Plaza Bottle Shop, Inc. v. Al Torstrick Ins. Agency, Inc.*, 712 S.W.2d 349, 351 (Ky.App.1986) (*quoting* 72 C.J.S. *Profession* § 4–5 (1951)), the great weight of modern authorities include architects in this group. *See In re Dawnwood Properties/78*, 209 F.3d 114, 116 (2d Cir. 2000) (under New York law, architects are included in the "learned professions"); *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1070 (1st Cir.1995) (architects are included in the "learned professions" pursuant to 29 C.F.R. § 541.3); *Rosen v. State Architects Licensure Bd.*, 763 A.2d 962, 965 (Pa.Com.Ct.2000) (architects and engineers are learned professions); *Kuntz v. Muehler*, 603 N.W.2d 43, 46 (N.D.1999) (doctors, attorneys, architects, and engineers are learned professions—electricians are not); *Port Authority v. Evergreen Int'l Aviation, Inc.*, 179 Misc.2d 674, 686 N.Y.S.2d 269, 273 (1999)

(architects, attorneys, accountants, and engineers are learned professions—insurance agents and brokers are not); *Porter Muirhead Cornia & Howard v. Wyoming Bd. of Certified Pub. Accountants*, 844 P.2d 479, 482 (Wyo.1992) (in addition to law and medicine, "learned profession" should also include architects, engineers, and accountants); *A.F. Blair Co., Inc. v. Mason*, 406 So.2d 6, 14 (La.Ct.App.1981) (architects and engineers are learned professions); *Harting v. Benham Eng'g Co.*, 519 P.2d 932, 934 (Okla.Ct.App.1974) (engineers are members of a learned profession); *State Board of Registration v. Rogers*, 239 Miss. 35, 43–44, 120 So.2d 772, 776, *suggestion of error overruled on other grounds by* 239 Miss. 35, 121 So.2d 720 (1960) (architects and engineers are members of a learned profession); *Clephane v. Progressive Realty & Bldg. Co.*, 1927 WL 2770 (Ohio Com. Pl.1927) ("The business of an architect has the dignity of a learned profession."); *Sherwood v. Wise*, 132 Wash. 295, 304, 232 P. 309, 312 (Wash.1925) ("There was a time when the learned profession seemed to be in some degree limited to three in number, to wit, religion, law, and medicine, but we apprehend no such narrow view can justifiedly be taken in this progressive age. Indeed, it seems hard to conceive of any older or more thoroughly recognized branch of learning than that of architecture."); *Smith v. Board of Education*, 115 Kan. 155, 222 P. 101 (1924) ("The business of an architect has the dignity of a learned profession."); 29 C.F.R. § 541.301 (architects qualify as members of the "learned professions."); *see generally Twaddell v. Anderson*, 136 N.C.App. 56, 61–63, 523 S.E.2d 710, 715–16 (1999), *rev. denied*, 351 N.C. 480, 543 S.E.2d 510 (2000) (looking to other jurisdictions for guidance and adopting a holding that "is consistent with the majority of other jurisdictions that have addressed this issue.").

Indeed, architecture is undoubtedly considered a "profession" in North Carolina, and the courts have found architects subject to the purview of N.C. Gen.Stat. § 1–15(c) governing "malpractice arising out of the performance or failure to perform professional services." Significantly, § 1–15(c) was enacted to alter the law of limitations applicable to medical malpractice. *See* N.C. Gen.Stat. Ann. § 1–15(c) (Lexis 1999) (Purpose & Effect of Subsection (c)). The statute has been interpreted to apply to circumstances where a professional relationship, such as that of physician-patient or attorney-client, exists. *See Doe v. American Nat'l Red Cross*, 798 F.Supp. 301 (E.D.N.C.1992). Thus, consistent with the modern view, it is apparent that North Carolina courts consider architects to be members of the class of "learned professions" who, like physicians and attorneys, by the nature of their profession owe a special duty to the public and occupy a unique place in the State's laws.

■ Having concluded that Defendants, being an architect and an architectural firm, qualify as members of a learned profession, the Court must determine whether the conduct in question qualifies as "rendering of professional services." Plaintiffs characterize Defendants' conduct as (1) the "solicitation of business at the Plaintiff's expense rather than the practice of architecture," and (2) "giving scientific advice outside the scope of any architectural expertise." Memorandum in Opposition, at 18. In support of their contention that the solicitation of business does not qualify as rendering professional services Plaintiffs rely on *Reid v. Ayers, supra. Id.* There, the court held that attorneys who were "attempting to collect moneys that were owed to their clients" were rendering professional services and therefore qualified for the learned profession exemption. 138 N.C.App. at 266–67,

531 S.E.2d at 235–36. The court reached this conclusion because it found that "[d]ebt collection, along with the collection of any attorney's fees incurred as a penalty, is a necessary part of the practice of debtor-creditor law." *Id.* Fortunately, this Court need not divine the precise scope of the practice of architecture, as the North Carolina legislature has set forth the definitive enunciation of what the "practice of architecture" means:

"Practice of Architecture" means performing or offering to perform or holding oneself out as legally qualified to perform professional services in connection with the design, construction, enlargement or alteration of buildings, including consultations, investigations, evaluations, preliminary studies, the preparation of plans, specifications and contract documents, administration of construction contracts and related services and construction of buildings, regardless of whether these services are performed in person or as the directing head of an office or organization.

N.C. Gen.Stat. § 83A–1(7). The plain language of this definition includes "offering to perform" professional services—which is precisely what Plaintiffs complain Defendants did here. This conduct, then, qualifies as "rendering of professional services" under the learned profession exemption and cannot serve as the basis for an unfair trade practices claim.

Plaintiffs reliance on *Reid* for the proposition that solicitation of business falls outside the learned profession exemption is misplaced. While the *Reid* court did state in *dicta* that "[a]dvertising is not an essential component to the rendering of legal services and thus would fall outside the exemption[,]" 138 N.C.App. at 267, 531 S.E.2d at 236, the legislature has not defined the practice of law to include "offering to perform" professional services as

they have the practice of architecture. *Compare* N.C. Gen.Stat. § 84–2.1 ("Practice of law" defined.) *with* N.C. Gen.Stat. § 83A–1(7) (Definitions—"Practice of architecture."). Thus, the *Reid* decision is consistent with the legislature's delimitation of the practice of law: *expressio unius est exclusio alterius.* Similarly, this Court is bound by the legislature's definition of the practice of architecture, which expressly includes "offering to perform" professional services.

■ Next, Plaintiffs contend that the advice offered by the Defendants to Dr. Patel fell "outside the scope of the provision of architectural services," inasmuch as their advice dealt with the remediation of mold infestation in the building. Memorandum in Opposition, at 18. According to Plaintiffs, mold remediation is not a matter about which Plaintiffs have any knowledge, or for which they could have offered any architectural services. This Court cannot accept Plaintiffs' cramped definition of architectural services, for it conflicts with the legislature's more inclusive understanding of the practice of architecture which encompasses, as noted *supra*, "performing or offering to perform professional services in connection with the design, construction, ... or alteration of buildings, including consultations, investigations, evaluations ... of construction contracts and related services and construction of buildings, regardless of whether these services are performed in person or as the directing head of an office or organization." N.C. Gen. Stat. § 83A–1(7). Moreover, though the case law on the issue of whether architects are qualified to address questions of the cause of mold infestation and the proper course of action for curing such infestations is sparse,[6] the cases of which the

Court is aware speak approvingly of an architect's role in such undertakings. *See Sho–Me Motor Lodges, Inc. v. Jehle–Slauson Constr. Co.,* 466 So.2d 83, 89–90 (Ala. 1985) (Plaintiff—hotel owner "could hardly be expected to file" a claim in a dispute with the contractor before the plaintiff's "architect gave his opinion as to the cause of the mildew[.]"); *Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp.,* 6 Haw. App. 125, 130, 712 P.2d 1148, 1153 (1985) (plaintiff hired an architect and structural engineer to investigate and analyze mold and mildew problems that developed after completion of construction). Therefore, Defendants' motion for judgment on the pleadings with respect to Plaintiffs' claim for unfair and deceptive trade practices will be granted.

## D. Negligence

■ Defendants move to dismiss Plaintiffs' negligence claim due to a lack of privity between them. It is clear that privity is not *per se* required to maintain a negligence action against an architect:

> An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects. Where breach of such contract results in foreseeable injury, economic or otherwise, to persons so situated by their economic relations, and community of interests as to impose a duty of due care, we know of no reason why an architect cannot be held liable for such injury.

*Quail Hollow East Condo. Ass'n v. Donald J. Scholz Co.,* 47 N.C.App. 518, 523, 268 S.E.2d 12, 16 (1980) (quoting *Davidson & Jones, Inc. v. County of New Hanover,* 41

---

**6.** Indeed, Plaintiffs rest their assertions that Defendants were acting outside the scope of the practice of architecture on the strength of their bare allegations alone; they cite no authorities in support of their position.

N.C.App. 661, 666–67, 255 S.E.2d 580, 584 (1979)) (internal citations omitted).

 The dispositive question is not whether the parties were in privity, but whether the Defendants owed a duty of care to Plaintiffs.

Whether ... a party has placed himself in such a relation with another so that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that the other will not be injured calls for the balancing of various factors: (1) the extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.

*Quail Hollow East*, 47 N.C.App. at 524–25, 268 S.E.2d at 17 (quoting *United Leasing Corp. v. Miller*, 45 N.C.App. 400, 263 S.E.2d 313, 318 (1980) (citations omitted)).

Unlike cases where the architect has "the power of economic life or death" over a contractor, *see Shoffner Indus., Inc. v. W.B. Lloyd Constr. Co.*, 42 N.C.App. 259, 266, 257 S.E.2d 50, 55–56 (1979), here there is no nexus between Plaintiffs and the Defendants, inasmuch as Defendants exercised no control or supervision over the Plaintiffs. *Compare id. with E.C. Goldman, Inc. v. A/R/C Assocs., Inc.*, 543 So.2d 1268 (Fla.Dist.Ct.App.1989). Here, as in *Goldman*, Plaintiffs were not harmed by the Defendant-architect's expert opinion, but rather by Dr. Patel's refusal to permit them access to the building based on that opinion, and by Dr. Patel's subsequent decision to terminate the illegal contract with Plaintiffs. *Cf. Goldman*, 543 So.2d at 1270–71. Similarly, there is no indication or allegation that Dr. Patel was bound by the Defendant-architect's recommendations. *Cf. id.*, at 1271–72.

 Moreover, Plaintiffs were not the persons to whom Defendants intended the information to be supplied, as required in order to state of cause of action for "information negligently supplied for the guidance of others." *See Howell v. Fisher*, 49 N.C.App. 488, 497, 272 S.E.2d 19, 25 (1980); Restatement (Second) of Torts § 552 (1977). Indeed, irrespective of who the intended recipients of the information were, Plaintiffs cannot even allege that *they* relied on the information (allegedly) negligently provided by Defendants. *Compare Davidson & Jones*, 41 N.C.App. at 668, 255 S.E.2d at 585 (imposing negligence liability, absent privity, where contractors relied on engineer's negligent misrepresentation of soil conditions, and where contractor incurred additional costs due to architect's negligent preparation of plans) *with Goldman*, 543 So.2d at 1270–72 (contractor did not rely on roofing consultant's recommendation that school board refuse payment for contractor's roofing job).

 In sum, because Plaintiffs and Defendants were not in privity of contract; because Plaintiff was not the intended beneficiary of the contract between the Defendants and Dr. Patel; because there was neither intended nor actual reliance by Plaintiffs on the Defendants' opinions, Defendants owed no duty of care to Plaintiffs and thus cannot be held liable by them for any negligence in the rendering of their opinions.[7] *See Goldman*, 543 So.2d at

---

**7.** Because the Court finds that Defendants owed no duty of care to Plaintiffs, the Court need not determine whether Plaintiffs fail to state a claim upon which relief can be granted inasmuch as they fail to allege that Defendants breached their contract with Dr. Patel.

1273; *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del.Super.Ct.1990). Furthermore, the Court finds that absent fraud, no moral blame can attach to Defendants' rendering of their expert opinion on a matter (mold remediation and building repair) over which they are qualified to evaluate. Public policy does not dictate a contrary result, as the public is best served by the rendering of uncircumscribed professional advice by architects concerning the safety and integrity of hotels and other buildings. Thus, Defendants' motion for judgment on the pleadings with respect to Plaintiffs' negligence claim will be granted.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' motion for judgment on the pleadings is **ALLOWED** and Defendants' complaint is dismissed by way of Judgment filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Defendants' motion for judgment on the pleadings is **ALLOWED,** and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.

*See Shoffner,* 42 N.C.App. at 266, 257 S.E.2d at 56 ("[T]he negligent breach by an architect of his contract with the owner gave rise to an actionable claim, sounding in tort, in favor of a stranger to the contract, including a contractor who allegedly had been damaged by the breach."); *Quail Hollow East,* 47 N.C.App. at 523, 268 S.E.2d at 16 (same).